# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

BRIAN Z.,

                                        Plaintiff,

        v.                                             5:20-CV-737
                                                     (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                         Defendant.

---

JUSTIN GOLDSTEIN, ESQ., for Plaintiff
LUIS PERE, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 4, 8).

## I.   PROCEDURAL HISTORY

On June 15, 2017, plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning March 12, 2017. (Administrative Transcript ("T") 177-183). Plaintiff's application was denied initially on September 14, 2017. (T. 65-77, 102-113). Administrative Law Judge ("ALJ") Robyn L. Hoffman granted plaintiff's request for a hearing and heard the testimony of both plaintiff and vocational expert Josiah L. Pearson on March 13, 2019. (T. 26-64). On March 29, 2019, the ALJ issued an order denying plaintiff's claim. (T. 7-24). The ALJ's decision became the

Commissioner's final decision when the Appeals Council denied plaintiff's request for review on May 5, 2020. (T. 1-6).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational

2

> factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.*  However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'"  *Brault*, 683 F.3d at 448.  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its

interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

Plaintiff was sixty years old on the date of the administrative hearing. (T. 30). He was a high school graduate who subsequently obtained an associates degree. (T. 30, 201). He was a military veteran who worked at the same large chain retail store for approximately seventeen years, in two distinct positions. (T. 224-26, 341). From 2000 to 2006, plaintiff managed a small grocery department within the store. (T. 32-35, 224-25). From 2006 to 2017, plaintiff worked in an overnight stocker position that covered all departments. (T. 35, 226). This position required frequent lifting of boxes of merchandise weighing about twenty pounds, and occasional lifting up to fifty pounds. (T. 226).

After fainting at work, plaintiff was diagnosed with an irregular heartbeat and had a pacemaker installed in 2013. (T. 37-38, 463). Plaintiff was able to return to his job after this episode, but worked at a slower pace. (T. 37-38). He also experienced

4

shortness of breath with heavy exertion, and managed these asthma symptoms with a rescue inhaler. (T. 38, 222, 463).

In June 2016, plaintiff was diagnosed with Dupuytren's contractures[1] in both hands. (T. 475).  In March 2017, plaintiff had surgery on his left hand. (T. 272-75). Although the surgery was initially deemed a success, plaintiff still experienced pain and stiffness in the left hand after six months of physical therapy. (T. 520).  He also received regular injections to alleviate the Dupuytren's contractures in his right hand. (T. 771).  He had not returned to work since his March 2017 surgery due to the impact on his ability to grip and lift heavier items. (T. 521, 525).

The ALJ's decision provides a detailed statement of the medical and other evidence of record. (T. 13-18).  Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.   **THE ALJ'S DECISION**

After reviewing the procedural history of the plaintiff's application and stating the applicable law, the ALJ found that plaintiff met the insured status requirements through December 31, 2022, and had not engaged in substantial gainful activity ("SGA") since the alleged onset date of March 12, 2017. (T. 12-13).  At step two of the sequential evaluation, the ALJ found that plaintiff had the following severe impairments: "left hand Dupuytren's contracture, status post excision (March 2017) left

---

[1] Dupuytren's contracture is a hand deformity that occurs when knots of tissue form under the skin of the palm, eventually creating a thick cord that can pull one or more fingers into a bent position. https://www.mayoclinic.org/diseases-conditions/dupuytrens-contracture/symptoms-causes/syc-20371943

little finger and carpometacarpal arthroplasty left thumb; arthritis of the left thumb; right hand Dupuytren's contracture; and asthma." (T. 13-14). At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a Listed Impairment. (T. 14).

At step four, the ALJ found that plaintiff had the RFC to perform less than the full range of light work, as defined in 20 C.F.R. §§ 404.1567(b). (T. 23-28). Specifically, she found that plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, sit for up to six hours, and stand or walk for approximately six hours in an eight-hour workday with normal breaks. (T. 14-18). Plaintiff also could perform frequent fine manipulation with both hands and retained the ability to grasp, hold, turn, raise, and lower objects with either hand. (*Id*.) The ALJ also found that plaintiff should avoid exposure to excessive amounts of respiratory irritants such as dust, odors, fumes, gases and extreme hot and cold temperatures. (*Id*.)

In making the RFC determination, the ALJ stated that she considered all of the plaintiff's symptoms, and the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529" and Social Security Ruling ("SSR") 16-3p. (*Id*.) The ALJ further stated that she considered opinion evidence and prior administrative medical findings pursuant to 20 C.F.R. §§ 404.1520c. (*Id*.) The ALJ also found that plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (T. 15).

Next, the ALJ found that plaintiff was unable to perform his past relevant work. (T. 18.)  The ALJ then evaluated the VE testimony, and found that "[c]onsidering the [plaintiff']'s age, education, work experience, and residual functional capacity, the [plaintiff] has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy"  that plaintiff can perform. (T. 18-20).  Accordingly, the ALJ determined that plaintiff was not disabled from the alleged onset date through the date of the ALJ's decision. (T. 20).

## V.   <u>ISSUES IN CONTENTION</u>

Plaintiff raises two arguments:

1.   The ALJ erred in his RFC determination by failing to properly evaluate the evidence, including medical opinions, and failing to develop the record by re-contacting plaintiff's treating sources. (Plaintiff's Brief ("Pl.'s Br.") at 10-22) (Dkt. No. 13).

2.   The ALJ's step five determination was not supported by substantial evidence because it relied on faulty VE testimony regarding the transferability of plaintiff's skills from prior employment. (Pl.'s Br. at 22-25).

Defendant contends that the Commissioner's determination should be affirmed because it was supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 3-17) (Dkt. No. 17).  For the reasons stated below, this court agrees with defendant and will dismiss the complaint.

## DISCUSSION

**VI.**   **RFC/EVALUATING MEDICAL EVIDENCE**

    **A.**   **Legal Standards**

        **1.**   **RFC**

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."   A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.   *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.   20 C.F.R. §§ 404.1545, 416.945.   *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).   An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements

regarding a plaintiff's capacities.  *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2.    Evaluation of Medical Opinion Evidence

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c)), 416.920c(a)-(c)).

Although the new regulations eliminate the perceived hierarchy of medical

sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. *Revisions to Rules*, 82 Fed. Reg. 5844-01 at 5853. An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with

the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5).  *Id.* at §§ 404.1520c(b)(3), 416.920c(b)(3).

### B.    Summary of Medical Opinion Evidence

In this case, the ALJ considered several medical opinions related to plaintiff's physical limitations.  Plaintiff has challenged the ALJ's evaluation of these opinions.  A summary of the opinion evidence and the ALJ's findings are set out below.

### 1.    Consultative Examiner Dr. Kautilya Puri

Dr. Kautilya Puri performed a consultative physical examination of plaintiff on August 16, 2017. (T. 463-67).  Prior to the examination, plaintiff reported a history of asthma, high blood pressure, and high cholesterol. (T. 463).  He described a fainting episode in 2013 that was likely caused by an irregular heartbeat, and prompted installation of a pacemaker. (*Id.*)  He also described his surgery and other treatment for his hand contractures, as well as the continued pain in the left hand when gripping and lifting (*Id.*)

During the examination, plaintiff demonstrated a normal gait and the ability to stand on heels and toes, but he could not walk on them. (T. 464).  He used no assistive devices, and did not require any assistance changing for the examination, getting on and off the examination table, or rising from a chair. (*Id.*)  Dr. Puri found full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally in both the cervical and lumbar spine. (T. 465)  Plaintiff showed full range of motion in his shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally. (*Id.*)  His joints

11

were stable and nontender except for shoulder and hand tenderness on palpation and movement. (*Id.*)  On examination, Dr. Puri found intact hand and finger dexterity, as well as full grip strength bilaterally. (*Id.*)

Based on his examination, Dr. Puri opined that plaintiff had no objective limitations in communication or fine motor or gross motor activity. (T. 466).  In his opinion, plaintiff had no objective limitations in his gait or activities of daily living, and had "mild" limitations in his ability to squat, bend, stoop, kneel, grip, and lift weights. (*Id.*)  Dr. Puri recommended that plaintiff not carry out strenuous activity or be in an environment likely to increase his respiratory complaints. (*Id.*)

The ALJ found most of Dr. Puri's opinion to be persuasive, because it was well-supported by objective examination findings, and was consistent with the medical evidence of record and Dr. Krist's opinion. (T. 17.)  She also found Dr. Puri's opinion to be consistent with plaintiff's ability to perform extensive daily activities and hobbies. (*Id.*)  However, the ALJ found that the restrictions described by Dr. Puri with regard to bending, squatting, stooping, and kneeling were not supported by the record.  (*Id.*)  In discounting this portion of the opinion, the ALJ noted the lack of complaints about postural limitations in plaintiff's functional report and testimony, and the lack of a diagnosed condition that would suggest postural limitations. (T. 17, 34-38, 217, 465).

### 2.    State Agency Consultant Dr. C. Krist

Dr. C. Krist, a state agency medical consultant, reviewed plaintiff's then-current medical records and issued an RFC Assessment on September 14, 2017. (T. 71-73).  The then-available record included Dr. Puri's consultative examination

report, pulmonology and cardiology treatment notes, and surgery and treatment notes for the Dupuytren's contracture in plaintiff's left hand. (T. 72-73). Based upon that review, Dr. Krist opined that plaintiff had the ability to perform light work. (T. 73.) Specifically, Dr. Krist opined that plaintiff could occasionally lift and/or carry up to twenty pounds, and could frequently lift and/or carry up to ten pounds. (T. 71). In Dr. Krist's opinion, plaintiff could stand and/or walk for a total of about six hours during an eight hour workday, and could sit for a total of six hours during an eight hour workday. (*Id.*) Dr. Krist also opined that plaintiff had no postural limitations, and no limitations with regard to reaching in any direction or handling, but was limited to frequent use of his left hand for fine manipulations. (T. 71-72). The consulting physician further opined that plaintiff should avoid concentrated exposure to extreme temperatures, wetness, humidity, fumes, odors, and gases due to his history of asthma. (T. 72).

The ALJ found Dr. Krist's opinion to be persuasive, because it was "well-supported by a clear explanation and reference to objective medical evidence." (T. 17). He also found the consultant's opinion to be consistent with the overall record, Dr. Puri's opinion, and plaintiff's description of his own abilities. (*Id.*) In reaching this conclusion, the ALJ noted that Dr. Krist's opinion was further bolstered by the physician's "relevant medical and program expertise and knowledge." (*Id.*)

### 3.      Orthopedic Surgeon Dr. Jon Loftus

The record did not contain any formal opinion from plaintiff's treating physicians. However, the ALJ considered a statement from Dr. Jon Loftus, the surgeon

13

who operated on plaintiff's left hand and evaluated his post-surgery progress. (T. 17-18).

On September 14, 2017, Dr. Loftus examined plaintiff six months after his hand surgery. (T. 520-21). Prior to the examination, plaintiff complained that he was lacking full flexion in all of his fingers, and still had discomfort around the surgical site. (T. 520). During the examination, Dr. Loftus found the extension of plaintiff's fingers to be "quite nice" but his flexion arc was not full. (T. 520-21). The physician opined that "Neither he nor I feel he is ready to return to work and given what he did for his job he likely will never be able to perform those activities but he will continue his home exercise program and I will officially keep him out of work and we will see him back in 2 months time."[2] (*Id.*)

The ALJ did not find this opinion persuasive or give it any evidentiary weight because it did not identify any functional limitations and it only addressed plaintiff's ability to return to his former employment, an issue solely reserved for the Commissioner. (T. 17-18).

## C.   Application

Having set forth the legal standard and the various medical opinions, the court will now explain its basis for concluding that the ALJ's evaluation of those opinions and the other record evidence was supported by substantial evidence.

---

[2] The ALJ also incorrectly described treatment notes from Nurse Practitioner Carmelita Woods (T. 525) and Physician's Assistant Ryan Bowser (T. 530-531) as notes from Dr. Loftus. (T. 17-18). These notes contained similar statements that plaintiff was not ready for a return to his previous employment.

Plaintiff, who is right hand dominant, has suffered from Dupuytren's contractures and arthritis in both hands for a number of years. (T. 37, 217-218, 450, 477). He consistently reported that he had the greatest difficulties with his left hand, even after March 2017 surgery and physical therapy. (T. 35, 447).  At his March 13, 2019 hearing, plaintiff that he had no problems with his right hand at that time, but his medical records show a history of treatment with injections, manual manipulation and topical arthritis cream. (T. 478, 771).

As discussed above, the ALJ found the opinions of Dr. Puri and Dr. Krist to be persuasive. (T. 17).  Plaintiff contends that this reliance to be improper, because Dr. Puri's opinion was based upon a single examination, and Dr. Krist's opinion was based on an incomplete medical record.  Neither contention is valid.

In assessing a plaintiff's RFC, an ALJ is entitled to rely on opinions from both examining and non-examining State agency medical consultants because such consultants are qualified experts in the field of social security disability.  *See Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record."); *Miller v. Comm'r of Soc. Sec.*, 13-CV-1388 (GLS), 2015 WL 1383816, at *8 (N.D.N.Y. Mar. 25, 2015) (both consultative examiner and non-examining physician were recognized experts in evaluation of medical issues in disability claims; [a]ccordingly, their opinions can be given weight, even greater weight than opinions of treating physicians, when, as here, they are supported by substantial evidence).  Such reliance is appropriate where the

consultant's opinion is supported by other record evidence.  *See Swan v. Astrue*, No. 09-CV-486-S, 2010 WL 3211049, at *5 (W.D.N.Y. August 11, 2010) ("State agency medical consultants are qualified experts in the evaluation of disability claims and as such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.").

Plaintiff has provided no evidence that Dr. Krist's September 2017 opinion was made stale by subsequent medical records.  *Maxwell H. v. Comm'r of Soc. Sec.*, 1:19-CV-0148 (LEK/CFH); 2020 WL 1187610, at *5 (N.D.N.Y. March 12, 2020) (A consultative opinion may become stale "if the claimant's condition deteriorates after the opinion is rendered and before the ALJ issues his decision.") (quoting *Clute ex rel. McGuire v. Comm'r of Soc. Sec.*, No. 18-CV-30, 2018 WL 6715361, at *5 (W.D.N.Y. Dec. 21, 2018).  Instead, the treatment notes after September 2017 indicate that the documented improvement in plaintiff's left hand had "plateaued" or reached maximum medical improvement, suggesting that plaintiff condition had not appreciably changed since Dr. Krist's review. (T. 520, 530-31).

Although follow-up treatment notes show that plaintiff still regularly complained of pain and stiffness in both hands, the overall treatment approach did not change, and his treatment providers only identified a frustrating lack of continued improvement with physical therapy, rather than any deterioration in plaintiff's ability to use his hands. (T. 531).  In notes cited by the ALJ, Dr. Loftus reviewed plaintiff's x-rays in June 2017 and observed "some scattered degenerative changes but nothing marked," and recommended that plaintiff "push" his physical therapy. (T. 16, 510).  Imaging reports

from January 2018 show weakness in the left wrist that the radiologist attributed to disuse following surgery, rather than any deterioration or new impairment. (T. 536).   In September 2018, an orthopedic surgeon, Dr. Walter Short, examined plaintiff's left hand and found no evidence of a recurrence of Dupuytren's or other contractures. (T. 775-776).  Dr. Short observed a Dupuytren's contracture impacting the right ring finger, and recommended continued injection treatment. (T 775).  Plaintiff had a full range of motion in the other fingers, with normal sensory and motor strength. (*Id*.)

Accordingly, the ALJ was not required to reject Dr. Krist's September 2017 opinion or seek an updated consultative report, because the subsequent records do not contain any additional evidence that may have changed the state medical expert's opinion.  *See Stottlar v. Colvin*, 15-CV-0340 (GTS), 2017 WL 972108, at *7 (N.D.N.Y. Mar. 10, 2017) (noting that "a medical consultant's failure to consider the complete medical record does not necessarily compel rejection of the medical consultant's opinions' or the ALJ's finding relying thereon'").  By itself, "[a] gap of time between when an opinion is rendered and the disability hearing and decision does not automatically invalidate that opinion." *Majdandzic v. Comm'r of Soc.* Sec., No. 17-CV-1172, 2018 WL 5112273, at *3 (W.D.N.Y. Oct. 19, 2018).  Only a "meaningful change" in Plaintiff's condition during the gap will do so.  *Lamar v. Comm'r of Soc. Sec.*, No. 18-CV-829, 2020 WL 548376, at *3 (W.D.N.Y. Feb. 4, 2020).  The ALJ could reasonably conclude that the medical records that post-date Dr. Krist's opinion showed no meaningful change.

Plaintiff also contends that the ALJ could not find both Dr. Puri's opinion and

Dr. Krist's opinion to be persuasive, because the opinions "grossly contradict" each other, and do not match the RFC determination that plaintiff could frequently perform fine manipulation with either hand. (Pl.'s Br. at 12-13).  Dr. Krist opined that plaintiff could perform frequent fine manipulation with his left hand, but found no limitations with plaintiff's right hand. (T. 71-73).  Dr. Puri found no limitations with fine or gross motor activity, but mild limitations in gripping and lifting weights. (T. 466).  The ALJ considered both these opinions, recognized the slight disparity between them, and extended the restrictions on fine manipulation bilaterally in light of record evidence of continuing mild residual impacts in both hands despite continuing treatment. (T. 16-17, 503-504, 510, 515, 531).

The ALJ's approach to formulating plaintiff's RFC was valid.  She was not required to accept every limitation in the various medical opinions nor craft an RFC mirroring a particular opinion.  *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he [is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole."). The decision to discount specific portions of the consultative opinions was also within her discretion.  *See Walker v. Colvin*, No. 3:15-CV-465 (CFH), 2016 WL 4768806, at *10 (N.D.N.Y. Sept. 13, 2016) ("[A]n ALJ may properly 'credit those portions of a consultative examiner's opinion which the ALJ finds supported by substantial evidence of record and reject portions which are not so supported.").

"[A]lthough there was no medical opinion providing the specific restrictions

reflected in the ALJ's RFC determination, such evidence is not required when 'the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity.'" *Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 109 (2d Cir. 2020) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (where "the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required."). In this case, the ALJ cited treatment notes showing showed improved function in the left hand following surgery but also documented arthritic changes, stiffness, and generalized pain. (T. 15, 445, 478, 510, 515, 775). The ALJ also noted the diagnosis of Dupuytren's contractures in plaintiff's right hand that required injections to relieve symptoms, despite generally normal examination results. (T. 15, 771-773). In addition, the ALJ considered plaintiff's statements that he was able to vacuum, mow the lawn, shop for groceries, camp, and play computer games despite pain and stiffness in his hands. (T. 16, 214-215, 355).

Plaintiff contends that the ALJ still had an obligation to contact Dr. Loftus to supply an opinion on plaintiff's functional limitations, beyond what was found in the treatment notes. (Pl.'s Br. at 19-20). However, plaintiff has not identified any gap in the record that would be filled by such opinion. *Bradley W. v. Comm'r of Soc. Sec.*, No. 19-1217, 2020 WL 5848833, at *13 (N.D.N.Y. Oct. 1, 2020) ("the ALJ is no longer required to recontact the treating source in order to properly develop the record"); *Benjalee W. v. Saul*, No. 18-1261, 2020 WL 1029023, at *5 (N.D.N.Y. Mar. 3, 2020)

("there is no obligation to re-contact a treating physician where the evidence of record is 'adequate to permit the ALJ to make a disability determination.'"); *Rodriguez v. Colvin*, No. 14-CV-1129, 2016 WL 447715, at *7 (N.D.N.Y. Feb. 4, 2016) (where ALJ had plaintiff's treatment records, as well as consultative medical opinions detailing the functional limitations caused by such impairments, ALJ was under no duty to seek a medical source statement from a treating provider before making his determination).

The ALJ devoted the bulk of her decision to an analysis of plaintiff's hand impairments, in large part due to plaintiff's unequivocal testimony that the ongoing difficulty with his left hand was the primary reason that he was unable to return to work. (T. 15, 39).  Plaintiff has similarly focused his arguments before this court on his ability to use his hands. (Pl.'s Br. at 11-18).  However, the ALJ also evaluated plaintiff's cardiac history and management of his asthma symptoms as part of the RFC analysis. (T. 14-15).  The ALJ cited cardiology treatment notes indicating that plaintiff had no significant cardiopulmonary difficulty such as chest pain or tightness, and his high blood pressure and high cholesterol appeared well-controlled with medication. (T. 13-14, 306, 316, 327, 391).  Likewise, plaintiff's asthma appeared well-controlled with as-needed use of his rescue inhaler and home nebulizer. (T. 15, 38-39, 260).  The ALJ still accounted for this impairments by limiting plaintiff to light work away from respiratory irritants, and the court finds that this determination was supported by substantial evidence. (T. 14-15).

Because the ALJ adequately explained her reliance on the medical records  and plaintiff's testimony as well as the persuasiveness of the medical opinion evidence, she

provided substantial evidence for her RFC determination, and there was no requirement that she further develop the record.

## VII.   Step Five Determination/Transferability of Skills

### A.      Legal Standards

If a claimant is unable to perform a full range of a particular exertional category of work, or the issue is whether a claimant's work skills are transferable to other jobs, then the ALJ may utilize the services of a vocational expert.  20 C.F.R. §§ 404.1566, 416.966.  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

If the ALJ utilizes a VE at the hearing, generally, the VE is questioned using a hypothetical question that incorporates plaintiff's limitations. Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony.  *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based [her] opinion." *Dumas*, 712 F.2d at 1554.  *See also Peatman v. Astrue*, No. 5:10-CV-307, 2012 WL 1758880, at *7 n.5 (D. Vt. May 16, 2012) (the hypothetical

question posed to the VE must accurately portray the plaintiff's physical and mental impairments) (citations omitted); *Green v. Astrue*, No. 08 Civ. 8435, 2012 WL 1414294, at *18 (S.D.N.Y. April 24, 2012) (citing *Dumas,* 712 F.2d at 1553-54).

Applicable Social Security regulations state that a claimant will be considered to have skills that are "transferable" when the "skilled or semi-skilled work activities [the claimant] did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."  20 C.F.R. § 404.1568(d)(1) (noting that this "depends largely on the similarity of occupationally significant work activities among different jobs").  The regulations explain that transferability of skills is "most probable and meaningful" among jobs in which: (1) the same or lesser degree of skills is required; (2) the same or similar tools and machines are used; and (3) the same or similar raw materials, products, processes or services are involved.  20 C.F.R. § 404.1568(d)(2).  However, a complete similarity of all three factors is not necessary for transferability.  20 C.F.R. § 404.1568(d)(2).

SSA has provided further guidance on transferability of skills.   SSR 82–41, *Work Skills and Their Transferability as Intended by the Expanded Vocational Factors Regulations*, 1982 WL 31389, at *1 (S.S.A. Feb. 26, 1979).  SSR 82-41 provides that transferability is most probable and meaningful among the jobs in which the same or lesser degree of skill is required and that, generally, the greater the degree of acquired skills, the less difficulty an individual will experience in transferring skills to other jobs.  *Id*., 1982 WL 31389, at *5.  In addition, "when a finding is made that a claimant has transferable skills, the acquired skills must be identified and specific occupations to

which the acquired work skills are transferable must be cited . . . in the ALJ's decision."
*Id*., 1982 WL 31389, at *7.

### B.    Application

 Advancing age is an important factor associated with transferability because it reduces the possibility of making a successful vocational adjustment.  *Id*. at *5.  SSR 82-41 provides:

> To find that an individual who is age 55 or over and is limited to sedentary work exertion has skills transferable to sedentary occupations, there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry.  The same is true for individuals who are age 60 and older and are limited to light work exertion. Individuals with these adverse vocational profiles cannot be expected to make a vocational adjustment to substantial changes in work simply because skilled or semiskilled jobs can be identified which have some degree of skill similarity with their PRW.  In order to establish transferability of skills for such individuals, the semiskilled or skilled job duties of their past work must be so closely related to other jobs which they can perform that they could be expected to perform these other identified jobs at a high degree of proficiency with a minimal amount of job orientation.

*Id*. at *5.

Plaintiff was 58 years old when he filed his DIB application, and 60 years old at the time of the disability determination, so the ALJ questioned the VE regarding plaintiff's transferable skills as well as the vocational adjustment needed to work in representative occupations, and incorporated this expert testimony into her step five determination. (T. 18, 42-43).  The VE testified that plaintiff had acquired the transferable skills of inventory control, customer service, and operation of electric powered loading machinery during his prior employment. (T. 42-43).  He also testified

that an individual with plaintiff's RFC and acquired skills would be able to transition to the positions of shipping checker and shipping order clerk with little, if any, vocational adjustment. (T. 19, 45-47).

Plaintiff makes two related arguments with regard to the ALJ's transferability analysis at step five - a general contention that the VE testimony did not establish that plaintiff could make a successful vocational transition to other jobs, and a specific contention that the VE erred by identifying available jobs that were classified under different Work Field ("WF") and Materials, Products Subject Matter and Services ("MPSMS") in the Dictionary of Occupational Titles, when compared to plaintiff's prior work. (Pl.'s Br. at 22-25).

This court will address the narrower argument first. In making this argument, plaintiff relies on Program Operations Manual System ("POMS") DT 25015.017, an internal SSA manual that recommends searching for occupations with the same or similar WF and MPSMS codes as part of the "Transferability of Skills Assessment." Plaintiff's argument fails. As the defendant correctly notes, POMS 25015.017 specifically provides that "[a]n absolute similarity of all these factors [tools, machines, raw materials, products, processes or services] is not necessary. POMS DI 25015.017(C)(3) (available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425015017). Moreover, the law of this Circuit is clear that POMS, as an internal policy guidance manual, does not impose judicially enforceable duties on an ALJ. *Tejada v. Apfel*, 167 F.3d 770, 775 (2d Cir. 1999) (holding that "POMS guidelines 'ha[ve] no legal force, and [they] do [ ] not bind the [Commissioner]' " ) (quoting *Schweiker v. Hansen*, 450

24

U.S. 785, 789 (1981)); *Edward T. v. Saul*, No. 1:18-CV-1482 (MAD), 2019 WL 5698056, at \*5 (November 4, 2019) ("[T]he POMS manual is merely internal guidance, and is not intended to be relied upon to create any right enforceable by law.").

Although the Second Circuit has not addressed the specific question of whether transferability of skills requires the same or similar WF or MPSMS codes, multiple federal courts have decisively rejected this argument.  *See Jones v. Comm'r of Soc. Sec.*, No. 8:19-CV-2962-T-30JSS, 2020 WL 8083592, at \*6 (M.D. Fla. December 21, 2020) (noting that the federal courts have consistently rejected the argument that reliance on the WF and MPSMS codes is required when assessing transferability of skills in a social security proceeding); *Cordileone v. Saul*, No. CV 18-06388-JEM, 2019 WL 5847832, at \*8 (C.D. Cal. November 7, 2019) (collecting cases that rejected the argument that transferability of skills requires similarity of WF or MPSMS codes); *Solomon v. Comm'r of Soc. Sec. Admin*., No. CV-18-00306-PHX-DWL, 2019 WL 1359129, at \*4 (D. Ariz. Mar. 26, 2019) (rejecting plaintiff's argument that because the MPSMS codes for his prior work position and a possible future work position were different, this meant that plaintiff would require significant vocational adjustment to work in the new position, and noting that the "ALJ's transferability determination was supported by the [VE's] testimony, which is itself substantial evidence sufficient to uphold the ALJ's decision"); *Bird v. Berryhill*, No. 17-1785-CJB, 2019 WL 1568519, at \* (D. Del. April 10, 2019) (rejecting argument that the ALJ erred in finding that plaintiff's prior skills were transferrable to jobs identified by the VE because the

MPSMS codes for the respective jobs differed).[3]   This court agrees with their analysis, and rejects plaintiff's argument regarding WF and MPSMS codes.

Plaintiff's more general challenge to the transferability of skills is premised on the VE's testimony that the representative occupations that plaintiff could perform may have "employer-specific skills as to their system and operations, which is usually learned within that SVP timeframe." (Pl.'s Br. at 22, citing T. 58).  Plaintiff contends that these additional "employer-specific skills" could take at least three and potentially six months of training and experience to acquire, and thus the jobs require additional skills beyond those transferable from Plaintiff's prior work. (Pl.'s Br. at 23).

This argument is not persuasive, because the VE consistently testified that the representative occupations would not require additional vocational adjustment.  For example, the ALJ asked:

Q:    All right.  Are there any additional skills required of these
       occupations?

A:    Your Honor, I - - no, I don't believe there would be.  These are all
       shipping, inventory control related positions . . . .

Q:    All right.  And just focusing since he's now 60, can you tell me are
       those occupations still similar to his past work that he would need to
       make very little bit [sic] any vocational adjustments in terms of
       tools, work processes, work settings, or the industry?

A:    Your Honor, I believe that overall yes - - or no.  There wouldn't  - -
       the position should fall within the requirements for transferability at

---

[3] Of course, a match of the WF or MPSMS codes can be substantial evidence that skills acquired in prior work are transferable to another job. *Gibbons v. Comm'r of Soc. Sec.,* No. 19-CV-33Sr, 2020 WL 4432073, at *7 (W.D.N.Y. July 31, 2020).  That does not mean there is a requirement that the job codes match.

the light level, that there would not be significant change or new skills that would need to be learned from that standpoint.

(T. 46).

As the following excerpts show, Plaintiff's representative pursued this same line of questioning during his cross-examination of the VE.

Q:   Okay.  Now, Mr. Pearson, if we have different work fields in different materials, products and subject matters codes, would the claimant have more than very little, if any, vocational adjustment to these occupations if he's working in a different work field or if he's using different materials, products and subject matters?

A:   I think  - - there's always that potential, but with the type of work we're looking at, which all three positions really involve essentially that stock checking component and the inventory control, I don't believe that, you know, that would be exactly true in this circumstance.

Q:   But by very definitely [sic] if we're using different materials, products and subject matters, wouldn't there be more than very little vocational adjustment?

A:   I guess - - no, I guess I'm not agreeing with that . . . I think overall the task and skills acquired to perform these tasks would really remain the same, and the products although might be somewhat different, we're still doing the same basic task with these jobs.

(T. 48-49).

Q:   But wouldn't that working at a transportation services warehouse - - wouldn't that encompass the work field code as opposed to the materials products and subject matter code?

A:   No, I don't believe so. . . . the difference - - if there's a difference would potentially - - it would be different settings of warehouses. We're looking at warehouse jobs working in essentially different industries, but the skills associated with it and the fact that it's a warehouse setting would all remain the same.  It would just be a different industry potentially that they'd be working in.

27

(T. 57).

> Q:    And that would be the only skill necessary to perform shipping
>        checker and shipping clerk jobs?  There wouldn't be any other skills
>        that someone would have to learn to do these positions?
>
> A:     I really - - no, I don't believe so.  I mean, besides employer-specific
>        skills as to their system and operations, which is usually learned
>        within that SVP timeframe, no I don't believe so.

(T. 58).

The VE repeatedly emphasized that the basic work skills in the representative occupations were the same or similar as those plaintiff had acquired through his prior work.  He also clarified that while there may be an adjustment period to a new industry or employer, the basic job tasks associated with the occupations were all the same.  Accordingly, the VE testimony relied upon by the ALJ provided substantial evidence that Plaintiff's skills would translate to specific other jobs that existed in significant numbers in the national economy.

The ALJ's reliance upon the detailed VE testimony is sufficient to satisfy her obligations under 20 C.F.R. § 404.1568(d)(1) and SSR 82-41, and she marshaled substantial evidence to support her determination that other work existed in significant numbers in the national economy that plaintiff could perform.  Accordingly, the ALJ's transferability of skills findings, and the ultimate determination that plaintiff was not disabled, were supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that judgment be entered for the **DEFENDANT.**

Dated:      August 11, 2021

Andrew T. Baxter
U.S. Magistrate Judge